FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

**Jul 21, 2022**

SEAN F. McAVOY, CLERK

Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Tyler H.L. Tornabene
Daniel H. Fruchter
Assistant United States Attorneys
Frieda K. Zimmerman
Special Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:22-CR-2059-MKD-1 |
| Plaintiff, | Plea Agreement |
| v. | |
| KARLA LETICIA PADILLA-REYNA, a.k.a. KARLA PADILLA | |
| Defendant. | |

Plaintiff United States of America, by and through Vanessa R. Waldref, United States Attorney the Eastern District of Washington, Tyler H. L. Tornabene and Daniel H. Fruchter, Assistant United States Attorneys for the Eastern District of Washington, and Frieda K. Zimmerman, Special Assistant United States Attorney for the Eastern District of Washington, and Defendant KARLA LETICIA PADILLA-REYNA ("Defendant"), both individually and by and through Defendant's counsel, Robin C. Emmans and Ulvar W. Klein, agree to the following Plea Agreement.

1.    Guilty Plea and Maximum Statutory Penalties

PLEA AGREEMENT - 1

1    Defendant agrees to enter a plea of guilty to Count 4 of the Indictment filed
2  on May 17, 2022, which charges Defendant with Wire Fraud, in violation of 18
3  U.S.C. § 1343, a Class C felony.
4    Defendant understands that the following potential penalties apply:
5      a.    a term of imprisonment of not more than 20 years;
6      b.    a term of supervised release of not more than 3 years;
7      c.    a fine of up to $250,000;
8      d.    restitution; and
9      e.    a $100 special penalty assessment.
10  2.   Supervised Release
11    Defendant understands that if Defendant violates any condition of
12  Defendant's supervised release, the Court may revoke Defendant's term of
13  supervised release, and require Defendant to serve in prison all or part of the term
14  of supervised release authorized by statute for the offense that resulted in such term
15  of supervised release without credit for time previously served on postrelease
16  supervision, up to 2 years in prison.
17    Accordingly, Defendant understands that if Defendant commits one or more
18  violations of supervised release, Defendant could serve a total term of
19  incarceration greater than the maximum sentence authorized by statute for
20  Defendant's offense or offenses of conviction.
21  3.   The Court is Not a Party to this Plea Agreement
22    The Court is not a party to this Plea Agreement and may accept or reject it.
23  Defendant acknowledges that no promises of any type have been made to
24  Defendant with respect to the sentence the Court will impose in this matter.
25    Defendant understands the following:
26      a.    sentencing is a matter solely within the discretion of the Court;
27      b.    the Court is under no obligation to accept any recommendations
28          made by the United States or Defendant;

PLEA AGREEMENT - 2

c.  the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

d.  the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

e.  the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

f.  the Court may reject recommendations made by the United States or Defendant, and that will not be a basis for Defendant to withdraw from this Plea Agreement or Defendant's guilty plea.

4.  Potential Immigration Consequences of Guilty Plea

If Defendant is not a citizen of the United States, Defendant understands the following:

a.  pleading guilty in this case may have immigration consequences;

b.  a broad range of federal crimes may result in Defendant's removal from the United States, including the offense to which Defendant is pleading guilty;

c.  removal from the United States and other immigration consequences are the subject of separate proceedings; and

d.  no one, including Defendant's attorney or the Court, can predict with absolute certainty the effect of a federal conviction on Defendant's immigration status.

Defendant affirms that Defendant is knowingly, intelligently, and voluntarily pleading guilty as set forth in this Plea Agreement, regardless of any immigration consequences that Defendant's guilty plea may entail.

5.  Waiver of Constitutional Rights

PLEA AGREEMENT - 3

Defendant understands that by entering this guilty plea, Defendant is knowingly and voluntarily waiving certain constitutional rights, including the following:

      a.    the right to a jury trial;

      b.    the right to see, hear and question the witnesses;

      c.    the right to remain silent at trial;

      d.    the right to testify at trial; and

      e.    the right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands that Defendant retains the right to be assisted by an attorney through the sentencing proceedings in this case and any direct appeal of Defendant's conviction and sentence, and that an attorney will be appointed at no cost if Defendant cannot afford to hire an attorney.

Defendant understands and agrees that any defense motions currently pending before the Court are mooted by this Plea Agreement, and Defendant expressly waives Defendant's right to bring any additional pretrial motions.

6.    <u>Elements of the Offense</u>

The United States and Defendant agree that in order to convict Defendant of Wire Fraud, in violation of 18 U.S.C. § 1343, as charged in Count 4 of the Indictment filed on May 17, 2022, the United States would have to prove the following beyond a reasonable doubt.

      a.    *First*, Defendant knowingly devised, intended to devise, or participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, promises, or omitted facts;

      b.    *Second*, the statements made or facts omitted as part of the scheme were material;

      c.    *Third*, Defendant acted with intent to defraud; and

PLEA AGREEMENT - 4

   d. *Fourth,* Defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

 7. <u>Factual Basis and Statement of Facts</u>

The United States and Defendant stipulate and agree to the following: the facts set forth below are accurate; the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for Defendant's guilty plea.

The United States and Defendant agree that this statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts that are relevant to the Sentencing Guidelines computation or sentencing, unless otherwise prohibited in this Plea Agreement.

<u>The Economic Injury Disaster Loan Program</u>

The Economic Injury Disaster Loan ("EIDL") program is a Small Business Administration ("SBA") program that provides low-interest funding to small businesses, renters, and homeowners affected by declared disasters. On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. That statute, along with the Coronavirus Preparedness and Response Supplemental Appropriations Act, authorized the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

In order to obtain an EIDL, a qualifying business was required to submit an application to the SBA providing information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was the year preceding January 31, 2020. The applicant was also required to certify that the information in the application was true and correct to the best of the applicant's

PLEA AGREEMENT - 5

1  knowledge.  The amount of an EIDL, if the application was approved, was

2  determined based, in part, on the information provided in the application about

3  employment, revenue, and cost of goods sold.  Any funds issued under an EIDL

4  were determined and issued directly by the SBA.  EIDL funds were eligible to be

5  used to payroll expenses, sick leave, production costs, and business obligations

6  such as debts, rent, and mortgage payments.  In addition to the EIDL loan amount,

7  EIDL applicants could also apply to obtain cash advances of up to $10,000 within

8  three days of application.  Advances, which were determined based on the number

9  of employees that the applicant certified having, did not have to be repaid.

10                        The Paycheck Protection Plan Loan Program

11        Another source of relief provided by the CARES Act was the authorization

12  of forgivable loans to small businesses for job retention and other certain expenses,

13  through a program referred to as the Paycheck Protection Program ("PPP").  In

14  order to obtain a PPP loan, a qualifying business was required to submit a PPP loan

15  application signed by an authorized representative of the business. The PPP loan

16  application required the business (through its authorized representative) to

17  acknowledge the program rules and make certain affirmative certifications in order

18  to be eligible to obtain the PPP loan. In the PPP loan application, the applicant

19  (through its authorized representative) was required to state, among other things:

20  (a) its average monthly payroll expenses; and (b) its number of employees. If the

21  applicant had no employees other than the owner, the applicant was required to

22  provide the gross income amount from a 2019 or 2020 IRS Form 1040, Schedule

23  C. These figures were used to calculate the amount of money the small business

24  was eligible to receive under the PPP. Additionally, the application was required to

25  certify that they were in operation as of February 15, 2020. The applicant was also

26  required to certify that the information in the application was true and correct to

27  the best of the applicant's knowledge.

28

PLEA AGREEMENT - 6

1     A business's PPP loan application was received and processed, in the first
2  instance, by a participating lender. If a PPP loan application was approved, the
3  participating lender funded the PPP loan using its own monies. Data from the
4  application, including information about the borrower, the total amount of the loan,
5  the listed number of employees, and the gross income amount, was transmitted by
6  the lender to the SBA, an agency of the United States, in the course of processing
7  the loan.

8                                 Queen B Collectibles LLC

9     Beginning no later than on or about April 2, 2020, and continuing through at
10  least April 22, 2021, in the Eastern District of Washington and elsewhere,
11  Defendant devised and intended to devise a scheme to defraud the SBA, and to
12  obtain money and property by means of materially false and fraudulent pretenses,
13  representations, and promises.  Specifically, Defendant applied for three PPP
14  loans, receiving two, using false and fraudulent information about her purportedly
15  active company, Queen B Collectibles, LLC, sometimes held out as Queen B
16  Enterprises (hereinafter collectively "Queen B"), with the intent to defraud, steal,
17  and convert the proceeds of the PPP Loans for Defendant's personal use and
18  without any intent to repay the PPP Loans.

19     Additionally, Defendant submitted five applications for EIDLs, and made an
20  application for a modification to an EIDL requesting additional funds, using false
21  and fraudulent information about her purportedly active company, Queen B, with
22  the intent to defraud, steal, and convert the proceeds of the EIDLs for Defendant's
23  personal use and without any intent to repay the EIDLs.  Of those EIDLs that
24  Defendant applied for, she obtained one EIDL with the intent to defraud, steal, and
25  convert the proceeds of that EIDL for her personal use and without any intent to
26  repay the EIDL.  All totaled through her three false and fraudulent PPP loan
27  applications and her six false and fraudulent EIDL applications, Defendant
28

PLEA AGREEMENT - 7

1  fraudulently requested a total of at least $256,168 on behalf of Queen B and

2  received a total of $59,602 on behalf of Queen B.

3  <u>Economic Injury Disaster Loan No. 5405907800</u>

4  On or about April 2, 2020, Defendant applied for an EIDL by submitting

5  application number 3600537630 to the SBA under the name of her purported

6  company, Queen B for EIDL No. 5405907800.  Defendant falsely stated and

7  certified, in the application, that Queen B had 3 employees as of January 31, 2020,

8  that its gross revenues for the 12-month period prior to January 31, 2020, were

9  $68,000.00, that its cost of goods sold for the 12-month period prior to January 31,

10  2020, was $35,000.00.  In fact, these representations and certifications were false

11  and Queen B and Defendant were not eligible for any EIDL funding.  As a result of

12  the fraud and relying on the materially false and fraudulent representations and

13  certifications made by Defendant, SBA approved the requested EIDL, and, on

14  April 26, 2020, disbursed an advance of $3,000 on EIDL Loan No. 540907800 and

15  on May 30, 2020, disbursed an additional $13,500 on that EIDL, to a personal

16  bank account of the Defendant's via the interstate wires.  On April 6, 7, and 14,

17  2020, Defendant submitted three additional EIDL applications in the name of

18  Queen B, making materially false and fraudulent representations and omissions on

19  each application to the SBA, and requesting a total amount of $153,800.

20  Additionally, on January 4, 2021, Defendant applied for another EIDL, through

21  application number 3316039429, and made materially false and fraudulent

22  representations and omissions on that application to the SBA, and requested a total

23  amount of $87,300.  On April 22, 2021, Defendant applied for additional funding

24  under EIDL No. 5405907800 in the name of Queen B in the total amount of

25  $45,000 and made materially false and fraudulent representations and omissions on

26  that application to the SBA.   However, the SBA did not ultimately disburse any of

27  the funds  Defendant fraudulently requested in these five additional EIDL

28  applications.

PLEA AGREEMENT - 8

1

2        ## Paycheck Protection Program Loan No. 54659282-05

3            On or about August 7, 2020, Defendant submitted an application for PPP

4    loan number 54659282-05 to the SBA in the name of her purported company,

5    Queen B.  Defendant falsely and fraudulently stated in the application for PPP loan

6    number 54659282-05 that Queen B had been established on October 18, 2018, that

7    it had 4 employees as of the date of the application, that its average monthly

8    payroll was $8,616.00, and requested a PPP loan for Queen B in the amount of

9    $21,500.  On or about August 11, 2020, as a result of the fraudulent scheme

10   described above, and the materially false and fraudulent information supplied by

11   Defendant in the application for PPP loan number 54659282-05, $21,500 was

12   disbursed into one of Defendant's bank accounts via the interstate wires.  On or

13   about October 20, 2021, Defendant falsely and fraudulently requested loan

14   forgiveness of the entire PPP loan amount by falsely representing that the PPP loan

15   proceeds had been used for eligible uses and expenses, including the false

16   representation that $14,565 of the loan amount had been used for payroll expenses.

17       ## Paycheck Protection Program Loan No. 17213483-08

18           On or about January 19, 2021, Defendant submitted an application for PPP

19   loan number 17213483-08 to the SBA in the name of her purportedly active

20   company, Queen B.  Defendant falsely and fraudulently stated in the application

21   for PPP loan number 17213483-08 that Queen B had been established in 2018, had

22   3 employees as of the date of the application, and that its average monthly payroll

23   was $8,641.00.  Based on that information, Defendant requested a PPP loan for

24   Queen B in the amount of $21,602.  These representations were materially false

25   and fraudulent.  Queen B was not an active business as of February 15, 2020,

26   meaning that Queen B was not eligible for any PPP funding. PPP loan number

27   17213483-08 was handled by Montana Community Development Corporation, a

28   lending institution located in Missoula, Montana, on a delegated basis from the

PLEA AGREEMENT - 9

SBA.  Montana Community Development Corporation submitted disbursement details for this loan into the SBA E-Tran system located in Sterling, Virginia.  On or about January 26, 2021, as a result of the fraudulent scheme described above, and the materially false and fraudulent information supplied by Defendant on the application for PPP loan number 17213483-08, Montana Community Development Corporation disbursed $21,602 through the interstate wires into Defendant's HAPO Account located in Richland, Washington, ending in 0030, which was not created until December 11, 2020, as a personal business account for Queen B.  On or about October 20, 2021, Defendant falsely and fraudulently requested loan forgiveness of the entire PPP loan amount by falsely representing that the PPP loan proceeds had been used for eligible uses and expenses, including the false representation that $13,256 of the loan amount had been used for payroll expenses.

<u>Paycheck Protection Program Loan No. 89259688-00</u>

On or about April 22, 2021, Defendant submitted an application for PPP loan number 89259688-00 to the SBA in the name of her purported company, Queen B.  Defendant falsely and fraudulently stated in the application for PPP loan number 89259688-00 that Queen B had been established on August 15, 2017, that it had 4 employees as of the date of the application, that its average monthly payroll was $25,707.00, and requested a PPP loan for Queen B in the amount of $64,266.  These representations were materially false and fraudulent.  However, the loan was canceled because Defendant did not supply the requested Schedule C tax form.

8.    <u>The United States' Agreements</u>

The United States Attorney's Office for the Eastern District of Washington agrees that at the time of sentencing, the United States will move to dismiss Counts 1, 2, and 3, of the Indictment filed on May 17, 2022, which charge Defendant with three counts of Wire Fraud, in violation of 18 U.S.C. § 1343, and counts 5, 6, and

PLEA AGREEMENT - 10

7, of the Indictment filed on May 17, 2022, which charge Defendant with three counts of False, Fictitious, or Fraudulent Claims, in violation of 18 U.S.C. § 287.

The United States Attorney's Office for the Eastern District of Washington agrees not to bring additional charges against Defendant based on information in its possession at the time of this Plea Agreement that arise from conduct that is either charged in the Indictment or identified in discovery produced in this case, unless Defendant breaches this Plea Agreement before sentencing.

9. United States Sentencing Guidelines Calculations

Defendant understands and acknowledges that the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") apply and that the Court will determine Defendant's advisory range at the time of sentencing, pursuant to the Guidelines. The United States and Defendant agree to the following Guidelines calculations.

a. Base Offense Level

The United States and the Defendant agree that the base offense level for Wire Fraud is 7. U.S.S.G. § 2B1.1(a)(1).

b. Special Offense Characteristics

The Defendant and the United States agree to recommend that the Defendant's base offense level should be increased by 12 levels, because the loss amount (actual and intended) was more than $250,000 and less than $550,000. See U.S.S.G. §2B1.1(b)(1)(G). The United States and Defendant are not aware of any other adjustments that apply. Defendant may argue the application of 2X1.1. The United States reserves the right to oppose the application of 2X1.1.

c. Acceptance of Responsibility

The United States will recommend that Defendant receive a three-level downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), (b), if Defendant does the following:

    i.    accepts this Plea Agreement;

    ii.    enters a guilty plea on July 21, 2022;

PLEA AGREEMENT - 11

        iii.       demonstrates recognition and affirmative acceptance of Defendant's personal responsibility for Defendant's criminal conduct;

        iv.       provides complete and accurate information during the sentencing process; and

        v.       does not commit any obstructive conduct.

The United States and Defendant agree that at its option and on written notice to Defendant, the United States may elect not to recommend a reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is charged with, or convicted of, any criminal offense, or if Defendant tests positive for any controlled substance.

        d.    <u>No Other Agreements</u>

The United States and Defendant have no other agreements regarding the Guidelines or the application of any Guidelines enhancements, departures, or variances. Defendant understands and acknowledges that the United States is free to make any sentencing arguments it sees fit, including arguments arising from Defendant's uncharged conduct, conduct set forth in charges that will be dismissed pursuant to this Agreement, and Defendant's relevant conduct.

        e.    <u>Criminal History</u>

The United States and Defendant have no agreement and make no representations about Defendant's criminal history category, which will be determined by the Court after the United States Probation Office prepares and discloses a Presentence Investigative Report.

    10.    <u>Incarceration</u>

The United States agrees to recommend a sentence no higher than the low end of the Guidelines, as calculated by the United States.

Defendant may recommend any legal sentence.

    11.    <u>Supervised Release</u>

PLEA AGREEMENT - 12

If the Court imposes a sentence of imprisonment, the United States and Defendant each agree to recommend 3 years of supervised release. Defendant agrees that the Court's decision regarding the conditions of Defendant's Supervised Release is final and non-appealable; that is, even if Defendant is unhappy with the conditions of Supervised Release ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or any term of Supervised Release.

The United States and Defendant agree to recommend that in addition to the standard conditions of supervised release imposed in all cases in this District, the Court should also impose the following conditions:

    a.    That the United States Probation Officer may conduct, upon reasonable suspicion, and with or without notice, a search of Defendant's person, residences, offices, vehicles, belongings, and areas under Defendant's exclusive or joint control.

    b.    That the Defendant disclose shall all assets and liabilities to United States Probation and shall not transfer, sell, give away, or otherwise convey or secret any asset, without the advance approval of the United States Probation Office.

    c.    That the Defendant be prohibited from incurring any new debt, opening new lines of credit, or enter any financial contracts or obligations without the prior approval of the United States Probation Office.

    d.    That the Defendant participate and complete financial counseling and life skills programs at the direction of the United States Probation Office.

12.    <u>Criminal Fine</u>

The United States and Defendant may make any recommendation concerning the imposition of a criminal fine.  Defendant acknowledges that the Court's decision regarding a fine is final and non-appealable; that is, even if Defendant is unhappy with a fine ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or fine.

13.    Mandatory Special Penalty Assessment

Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, pursuant to 18 U.S.C. § 3013.

14.    Restitution

The United States and Defendant agree that restitution is appropriate and mandatory, without regard to Defendant's economic situation, to identifiable victims who have suffered physical injury or pecuniary loss, pursuant to 18 U.S.C. §§ 3663A, 3664.

Pursuant to 18 U.S.C. § 3663(a)(3), Defendant voluntarily agrees to pay restitution for all losses caused by Defendant's individual conduct, in exchange for the United States not bringing additional potential charges, regardless of whether counts associated with such losses will be dismissed as part of this Plea Agreement. With respect to restitution, the United States and Defendant agree to the following:

a.    Restitution Amount and Interest

The United States and Defendant stipulate and agree that, pursuant to 18 U.S.C. §§ 3663, 3663A and 3664, the Court should order restitution in an amount of $302,145.40, and that any interest on this restitution amount, if any, should be waived.

b.    Payments

To the extent restitution is ordered, the United States and Defendant agree

PLEA AGREEMENT - 14

1   that the Court will set a restitution payment schedule based on Defendant's

2   financial circumstances. 18 U.S.C. § 3664(f)(2), (3)(A). Regardless, Defendant

3   agrees to pay not less than 10% of Defendant's net monthly income towards

4   restitution.

5              c.    Treasury Offset Program and Collection

6         Defendant understands the Treasury Offset Program ("TOP") collects

7   delinquent debts owed to federal agencies. If applicable, the TOP may take part or

8   all of Defendant's federal tax refund, federal retirement benefits, or other federal

9   benefits and apply these monies to Defendant's restitution obligations. 26 U.S.C.

10  § 6402(d); 31 U.S.C. § 3720A; 31 U.S.C. § 3716.

11        Defendant understands that the United States may, notwithstanding the

12  Court-imposed payment schedule, pursue other avenues to ensure the restitution

13  obligation is satisfied, including, but not limited to, garnishment of available funds,

14  wages, or assets. 18 U.S.C. §§ 3572, 3613, and 3664(m).

15        Nothing in this acknowledgment shall be construed to limit Defendant's

16  ability to assert any specifically identified exemptions as provided by law, except

17  as set forth in this Plea Agreement.

18        Until Defendant's fine and restitution obligations are paid in full, Defendant

19  agrees fully to disclose all assets in which Defendant has any interest or over

20  which Defendant exercises control, directly or indirectly, including those held by a

21  spouse, nominee or third party.

22        Until Defendant's fine and restitution obligations are paid in full, Defendant

23  agrees to provide waivers, consents, or releases requested by the U.S. Attorney's

24  Office to access records to verify the financial information.

25              d.    Notifications and Waivers

26        Defendant agrees to notify the Court and the United States of any material

27  change in Defendant's economic circumstances (e.g., inheritances, monetary gifts,

28  changed employment, or income increases) that might affect Defendant's ability to

PLEA AGREEMENT - 15

pay restitution. 18 U.S.C. § 3664(k). Defendant also agrees to notify the United States of any address change within 30 days of that change. 18 U.S.C. § 3612(b)(1)(F). These obligations cease when Defendant's fine and restitution obligations are paid in full.

Defendant acknowledges that the Court's decision regarding restitution is final and non-appealable; that is, even if Defendant is unhappy with the amount of restitution ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or restitution order.

15.    <u>Payments While Incarcerated</u>

If Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, Defendant agrees to earn money toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

16.    <u>Additional Violations of Law Can Void Plea Agreement</u>

The United States and Defendant agree that the United States may, at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its sentencing recommendation if, prior to the imposition of sentence, Defendant is charged with or convicted of any criminal offense or tests positive for any controlled substance.

17.    <u>Waiver of Appeal Rights</u>

Defendant understands that Defendant has a limited right to appeal or challenge Defendant's conviction and the sentence imposed by the Court.

Defendant expressly waives all of Defendant's rights to appeal Defendant's conviction and the sentence the Court imposes.

Defendant expressly waives Defendant's right to appeal any fine, term of supervised release, or restitution order imposed by the Court.

Defendant expressly waives the right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28

PLEA AGREEMENT - 16

U.S.C. § 2255, except one based on ineffective assistance of counsel arising from information not now known by Defendant and which, in the exercise of due diligence, Defendant could not know by the time the Court imposes sentence.

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

18.   Compassionate Release

In consideration for the benefits Defendant is receiving under the terms of this Plea Agreement, Defendant expressly waives Defendant's right to bring any motion for Compassionate Release other than a motion arising from one of the specific bases set forth in this paragraph of this Plea Agreement.  The United States retains the right to oppose, on any basis, any motion Defendant files for Compassionate Release.

The only bases on which Defendant may file a motion for Compassionate Release in the Eastern District of Washington are the following:

        a.   Medical Condition of Defendant

              i.   Defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia; or

              ii.   Defendant is suffering from a serious physical or medical condition, a serious functional or cognitive impairment, or deteriorating physical or mental health because of the aging process that substantially diminishes the ability of

PLEA AGREEMENT - 17

the defendant to provide self-care within the environment of a correctional facility and from which Defendant is not expected to recover.

b.  Age of Defendant

   i.  Defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process; and has served at least 10 years or 75 percent of Defendant's term of imprisonment, whichever is less; or

   ii.  Defendant is at least 70 years old and has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which Defendant is imprisoned.

c.  Family Circumstances

   i.  The caregiver of Defendant's minor child or children has died or become incapacitated, and Defendant is the only available caregiver for Defendant's minor child or children; or

   ii.  Defendant's spouse or registered partner has become incapacitated, and Defendant is the only available caregiver for Defendant's spouse or registered partner.

d.  Subsequent Reduction to Mandatory Sentence

   i.  Defendant pleaded guilty to an offense which, on the date of Defendant's guilty plea, carried a mandatory minimum sentence; and

   ii.  after the entry of judgment, the length of the mandatory minimum sentence for Defendant's offense of conviction was reduced by a change in the law; and

        iii.    the application of the reduced mandatory minimum sentence would result in Defendant receiving a lower overall sentence.

    e.    <u>Ineffective Assistance of Counsel</u>

        i.    Defendant seeks Compassionate Release based on a claim of ineffective assistance of counsel arising from information that Defendant both

            1.    did not know at the time of Defendant's guilty plea, and

            2.    could not have known, in the exercise of due diligence, at the time the Court imposed sentence.

19.    <u>Withdrawal or Vacatur of Defendant's Plea</u>

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

    a.    this Plea Agreement shall become null and void;

    b.    the United States may prosecute Defendant on all available charges;

    c.    The United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

    d.    the United States may file any new charges that would otherwise be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

PLEA AGREEMENT - 19

1    Defendant agrees to waive any objections, motions, and defenses Defendant
2  might have to the United States' decision about how to proceed, including a claim
3  that the United States has violated Double Jeopardy.
4    Defendant agrees not to raise any objections based on the passage of time,
5  including but not limited to, alleged violations of any statutes of limitation or any
6  objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth
7  Amendment.
8    20.    Waiver of Attorney Fees and Costs
9    Defendant agrees to waive all rights Defendant may have under the "Hyde
10  Amendment," Section 617, P.L. 105- 119 (Nov. 26, 1997), to recover attorneys'
11  fees or other litigation expenses in connection with the investigation and
12  prosecution of all charges in the above-captioned matter and of any related
13  allegations (including, without limitation, any charges to be dismissed pursuant to
14  this Plea Agreement or any charges previously dismissed or not brought as a result
15  of this Plea Agreement).
16    21.    Integration Clause
17    The United States and Defendant acknowledge that this document
18  constitutes the entire Plea Agreement between the United States and Defendant,
19  and no other promises, agreements, or conditions exist between the United States
20  and Defendant concerning the resolution of the case.
21    This Plea Agreement is binding only on the United States Attorney's Office
22  for the Eastern District of Washington, and cannot bind other federal, state, or local
23  authorities.
24    The United States and Defendant agree that this Agreement cannot be
25  modified except in a writing that is signed by the United States and Defendant.
26  \\
27  \\
28  \\

PLEA AGREEMENT - 20

<u>Approvals and Signatures</u>

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Vanessa R. Waldref
United States Attorney

_____          _____
Tyler H.L. Tornabene                                              Date
Daniel H. Fruchter
Assistant United States Attorneys
Frieda K. Zimmerman
Special Assistant United States Attorney

I have read this Plea Agreement and I have carefully reviewed and discussed every part of this Plea Agreement with my attorney.  I understand the terms of this Plea Agreement.  I enter into this Plea Agreement knowingly, intelligently, and voluntarily.  I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case.  No other promises or inducements have been made to me, other than those contained in this Plea Agreement.  No one has threatened or forced me in any way to enter into this Plea Agreement.  I agree to plead guilty because I am guilty.

_____          _____
Karla Leticia Padilla Reyna                                   Date
Defendant

PLEA AGREEMENT - 21

1        I have read the Plea Agreement and have discussed the contents of the
2    agreement with my client. The Plea Agreement accurately and completely sets
3    forth the entirety of the agreement between the parties.  I concur in my client's
4    decision to plead guilty as set forth in the Plea Agreement.  There is no legal
5    reason why the Court should not accept Defendant's guilty plea.

6
7    _____      7/21/2022
8    Robin C. Emmans                            Date
9    Ulvar W. Klein
     Attorneys for Defendant

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLEA AGREEMENT - 22